**Nos. 22-1340; 22-1421**

_____

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**BARDON, INC., d/b/a Aggregate industries**

**Petitioner/Cross-Respondent**

**v.**

**NATIONAL LABOR RELATIONS BOARD**

**Respondent/Cross-Petitioner**

**and**

**INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP
BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, AFL-CIO**

**Intervenor**

_____

**On Petition For Review And Cross-Application For Enforcement Of An
Order of The National Labor Relations Board**

_____

**BRIEF FOR INTERVENOR INTERNATIONAL BROTHERHOOD OF
BOILERMAKERS**

Brandon E. Wood
Blake & Uhlig, P.A.
753 State Ave., Suite 475
Kansas City KS, 66101
(913)321-8884
bew@blake-uhlig.com
Attorneys for Intervenor

# DISCLOSURE STATEMENT

Nos.: <u>22-1340; 22-1421</u>

Caption:    <u>*Bardon, Inc. v. National Labor Relations Board*</u>

Pursuant to FRAP 26.1 and Local Rule 26.1, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, forgers and Helpers AFL-CIO, who is Intervenor, makes the following disclosures:

1. Is this party a publicly held corporation or other publicly held entity?    **<u>NO</u>**

2. Does this party have any parent corporations?    **<u>NO</u>**

3. Is 10% or more of the stock of the party owned by a publicly held corporation or other publicly held entity?    **<u>NO</u>**

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    **<u>NO</u>**

5. Is the party a trade association?    **<u>NO</u>**

6. Does this case arise out of a bankruptcy proceeding?    **<u>NO</u>**

7. Is this a criminal case in which there was an organizational victim?    **<u>NO</u>**

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................ i

TABLE OF AUTHORITIES .............................................................. iv

STATEMENT OF JURISDICTION.................................................1

STATEMENT OF ISSUE..................................................................1

STATEMENT OF THE CASE...........................................................2

   I.  Background.................................................................................2

   II.  The Union Began an Organizing Campaign at the Company's Millville Location, Lead by Jose Molina.................................................3

   III.   The Company Engaged in an Aggressive Anti-Union Campaign in Response to the Organizing Effort ...............................................3

   IV.   Immediately Following the Election, the Company Terminated the Discriminatees.................................................................................6

   V.  The Company Subsequently Changed Enforcement of its LOTOTO Policies and held Retraining Sessions .............................................21

   VI.   The Board's Conclusions and Order ...........................................23

SUMMARY OF ARGUMENT .........................................................25

STANDARD OF REVIEW ...............................................................27

ARGUMENT ......................................................................................29

   I.  Substantial Evidence Supports the Board's Findings that the Company Violated Section 8(a)(1) of the Act via statements made by Supervisor Mills, which Constituted Threats of Unspecified Reprisals and which Gave Employees the Impression that their Union Activities and Support were under Surveillance. 29

   II.  Substantial Evidence Supports the Boards Findings that the Company Violated Section 8(a)(1) of the Act via Unlawful Interrogations of Employees Concerning Their Union Sympathies and Support.................................33

   III.   Substantial Evidence Supports the Board's Findings that the Company Violated Sections 8(a)(1) and (3) of the Act by Terminating the Discriminatees35

   IV.   Substantial Evidence Supports the Findings that the Company would not have Terminated the Discriminatees absent Molina's Protected Activity ..........48

V.  The Company's Credibility Arguments are Without Merit ...........................52

CONCLUSION .......................................................................................................56

# TABLE OF AUTHORITIES

*Cases*

*Advanced Masonry Associates, LLC*, 366 NLRB No. 57 (2018).................39, 40, 42

*Alpo Petfoods, Inc. v. NLRB*, 126 F.3d 246 (4th Cir. 1997)...............................27, 36

*Austal USA, LLC*, 356 NLRB 363 (2010)..................................................................40

*C&L Systems Corp*, 299 NLRB 366 (1990).................................................................45

*Cadbury Beverages v. NLRB*, 160 F.3d 24 (D.C. Cir. 1979)....................................41

*Camaco Lorain Mfg. Plant*, 356 NLRB 1182 (2011)...............................................34

*Corliss Resources, Inc.*, 362 NLRB 195 (2015).........................................................24

*Corn Brothers Inc.*, 262 NLRB 320 (1982)...............................................................38

*Coronet Foods, Inc. v. NLRB*, 158 F.3d 782, 788 (4th Cir. 1998).........................29

*Diva Carina Bay Resort*, 356 NLRB 316, 219 (2010)...............................................31

*Dorsey Trailers, Inc. v. NLRB*, 233 F.2d 831, 838 (4th Cir. 2000)........................27

*FPC Holdings, Inc. v. NLRB*, 64 F.3d 935 (4th Cir. 1995)......................................36

*George L. Mee Memorial Hosp.*, 348 NLRB 327 (2006).........................................31

*Grinnell Fire Protection Sys. Co. v. NLRB*, 236 F.3d 187 (4th Cir. 2000)..............28

*Indus. TurnAround Corp. v. NLRB*, 115 F.3d 248 (4th Cir. 1997)........................29

*Inova Health System v. NLRB*, 795 F.3d 68 (D.C. Cir. 2015)................................39

*Montgomery Ward & Co.*, 316 NLRB 1248 (1995)...........................................38, 41

*NLRB v. Air Contact Transp. Inc.*, 403 F.3d 206 (4th Cir. 2005)...........................28

*NLRB v. Curtin Matheson Scientific., Inc.*, 494 U.S. 775(1990).............................29

iv

*NLRB v. Danial Cons. Co.*, 731 F.2d 191 (4th Cir. 1984).......................................28

*NLRB v. General Wood Preserving Co.*, 905 F.3d 803 (4th Cir. 1990)....................28

*NLRB v. Grand Canyon Min. Co.*, 116 F.3d 1039 (4th Cir. 1997)..........................49

*NLRB v. Instrument Corp. of America*, 714 F.2d 324 (4th Cir. 1983)...............37, 49

*NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344 (1953).......................................29, 55

*NLRB v. Thermon Heat Tracing Servs.*, 143 F.3d 181 (5th Cir. 1998)...................41

*NLRB v. Transpersonnel, Inc.*, 349 F.3d 175 (4th Cir. 2003)...........................29, 53

*NLRB v. Walton Mfg. Co.*, 369 U.S. 404 (1962)...................................................28

*Owens-Corning Fiberglass Corp. v. NLRB*, 407 F.2d 1357 (4th Cir. 1969).....28

*Robert F. Kennedy Medical Center*, 332 NLRB 1536 (2000)................................30

*Rossmore House*, 269 NLRB 1176 (1984).................................................................33

*Royal Laundry*, 277 NLRB 820, 830 (1985)............................................................34

*Tecnocap, LLC v. NLRB*, 1 F.4th 304 (4th Cir. 2021)............................................27

*TNT Logistics of N. Am., Inc. v. NLRB*, 413 F.3d 402 (4th Cir. 2005)....................49

*Ultrasystems Western Constructors, Inc. v. NLRB*, 18 F.3d 251 (4th Cir. 1994).......55

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)........................................28

*Wright Line*, 251 NLRB 1083 (1980).........................................................23, 36, 37

*WXGI, Inc. v. NLRB*, 243 F.3d 833 (4th Cir. 2001)................................................36

**Statutes**

29 U.S.C. § 151......................................................................................................1

29 U.S.C. § 157....................................................................................................36

29 U.S.C. § 158....................................................................................................30

29 U.S.C. § 160...............................................................................................1, 56

## STATEMENT OF JURISDICTION

This case is before the Court on the petition of Bardon, Inc. ("the Company") to review, and the cross-application of the National Labor Relations Board ("the Board") to enforce, the Board's Decision and Order, reported at 371 NLRB No. 78. The International Brotherhood of Boilermakers (the "Union") intervened in this matter on the side of the Board, seeking the enforcement of the Board's Decision and Order.

The Board had jurisdiction over this unfair labor practice case pursuant to Section 10(a) of the National Labor Relations Act, as amended (29 U.S.C. §§ 151, 160(a)) ("the Act"). The Board's Order is final under Section 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f).

## STATEMENT OF ISSUE

Whether substantial evidence supports the Board's findings that the Company violated Sections 8(a)(1) and (3) of the Act by terminating Jose Molina, (hereinafter "Molina" or the "Discriminatee"), directly following a union organizing drive which Molina was heavily involved in, and additionally violated Section 8(a)(1) of the Act by statements and interrogations made by supervisors and management which gave employees the impression that their union activities were under surveillance, and/or which constituted threats of unspecified reprisals for employees' protected concerted activity.

1

## STATEMENT OF THE CASE

This unfair labor practice case arises from unlawful statements and interrogations on the part of Company representatives prior to a union representation election, as well as the Company's unlawful retaliation via its suspension and ultimate termination of Molina, the leader of the Union's organizing efforts, just one (1) day following the election.

### I.     Background

The Company operates a quarry in Millville, West Virginia (hereinafter the "Millville Plant"). (JA1075). Prior to the election at issue here, the Company's employees were not represented by a union at the Millville Plant.

Andy Wright ("Wright") was hired by the Company in February 2019, and served as a Plant Manager for the Millville Plant from April 2019 through October 2020. (Wright JA0026:8-11; JA0027:15-16). Wright reported directly to Operations Manager Jim Bottom ("Bottom"), who was responsible for several plants in the Company's mid-Atlantic Region. (Wright JA0027:3-4; JA1264).  At the time of the union election campaign and the terminations at issue in this matter, Curtis L. Mills ("Supervisor Mills") served as 2nd Shift Production Supervisor, and reported directly to Wright. (JA1264).

## II. The Union Began an Organizing Campaign at the Company's Millville Location, Lead by Jose Molina

In 2019, the Union began an organizing campaign at the Millville Plant, and in June 2019, the Union filed a petition for an election with the Board in order to be recognized as the bargaining representative for the Company's employees at the Millville Plant. (Alberto JA0598:18-19).

Jose Molina ("Molina"), a second shift mechanic, led the Union's organizing effort. (Rutherford JA0313:16-19; Osborne JA0409:4-6). Molina began working for the Company at the Millville quarry in 2003. (Molina JA0179:19-20). Molina met with coworkers to discuss unionization, collected signed union authorization cards, and served as the Union's designated election observer during the election. (Rutherford JA0313:16-19; Osborne JA0409:4-6).

## III. The Company Engaged in an Aggressive Anti-Union Campaign in Response to the Organizing Effort

After being served with the Petition, the Company began an aggressive anti-union campaign. Bottom testified that upon becoming aware of the organizing effort, the Company held a meeting with members of upper management to discuss the Company's response. (Bottom JA1044:1-9).

The Company held captive audience meetings with groups of employees on each of its shifts, led by Wright and Bottom. (Wright JA0066:16-19; Bottom

3

JA1046:15-JA1047:5). Bottom testified that employees were "inundated" with such meetings. (Bottom JA1047:10-22).

In addition to captive-audience meetings, Company representatives, including Wright and Bottom, held one-on-one meetings with employees. (Wright JA0082:20-JA0083-3; Bottom JA1047:6-22). Bottom met with Molina approximately two (2) days prior to the election (Molina JA0202:1-JA0203:4; Bottom JA1049:17-JA1050: 3). The conversation took place on the "catwalk" above equipment at the Plant, while the plant was running.[1] (Molina JA0203:15-JA0204:8). Bottom initiated the conversation, and began by asking Molina what concerns employees had, and why employees wanted union representation. (Molina JA0202:11-19). Bottom testified that during this conversation, Molina indicated that he was asked to represent the union as the observer during the election, and stated that the Union was going to win the election. (Bottom JA1049:17-JA1050:3).

Bottom also had a one-on-one conversation with second shift haul-truck driver Thomas Johns ("Johns") prior to the election. (Johns JA0504:8-24; Bottom JA1048:25-JA1049:16). The night before the election, Bottom stopped Johns while he was working and got into Mr. Johns' loader, and rode along with him for what

---

[1] As Molina explained, per the Company's safety rules, employees are not supposed to even be on the catwalk when the plant is running. (Molina JA0203:22-JA0204:8). However, that day Supervisor Mills told Molina to go onto the catwalk to clean material off of it, while the plant was running. (Molina JA0203:9-15).

Johns believed to be over an hour. (Johns JA0504:1-16). Johns testified that during the conversation, Bottom told Johns that if the Union won the election, the employees would lose their 401(k) and vacation time. (Johns JA0504:8-16). Johns also testified that Bottom asked him if he knew anyone that is in a union and "how he felt" about the Union. (Johns JA0504:17-JA0505:4).

Bottom had a similar one-on-one conversation with Moris Alberto ("Alberto") before the election. Alberto testified that during the conversation, Bottom asked how he intended to vote in the election. (Alberto JA0593:11-25; JA0594:3-7).

Supervisor Mills made statements to employees about the Union in the weeks leading up to the election. Molina and Alberto testified that, shortly before the election, Supervisor Mills approached them to discuss the Union while they were working. (Molina JA0196:1-22; JA0597:9-18). Supervisor Mills began the conversation by stating that he had heard about the election, and stating that there was no reason to vote for the Union. (Molina JA0196:1-22). Both Molina and Alberto testified that during this conversation, Supervisor Mills stated that he knew that the second shift was responsible for the organizing campaign, and that they were "pulling the train" for the Union. (Molina JA0199:8-11; Alberto JA0587:9-13). Molina testified that he felt that Supervisor Mills was attempting to get information about the organizing campaign during this conversation. (Molina JA0197:3-9).

Alberto testified that in a separate conversation, Supervisor Mills told him that management knew that second shift were the "troublemakers." (JA0599:3-7). Another second-shift employee, Tim Rutherford, testified that a few weeks before the election, Supervisor Mills told Rutherford that he knew that Molina was a "troublemaker," that was responsible for "trying to bring [the Union] in." (Rutherford JA0315:1-3).

Approximately one week before the election, Supervisor Mills told Rutherford and other employees that he only had to be nice to them for one more week. (Rutherford JA0385:1-20). Rutherford understood this statement to mean that if the Union was elected, the Company would retaliate against employees. (Rutherford JA0385:19-20).

## IV. Immediately Following the Election, the Company Terminated the Discriminatee

The election was held on June 27, 2019, and the Union was victorious. Just one day following the election, the Company suspended and ultimately terminated Molina.

As the basis for the terminations, the Company relies on a purported violation of its "Lock-Out, Tag-Out, and Try-Out" ("LOTOTO") procedures, claiming that during the second shift on June 28, 2019, Molina failed to properly perform such procedures while working on a conveyer belt in the quarry.

6

Below is a description of the Company's LOTOTO policies and practices, as well as the events of the June 28, 2019 shift.

### 1. The Company's LOTOTO Policies and Practice

LOTOTO is a policy under which employees place physical locks on the electrical box for a particular piece of equipment to ensure that the equipment is de-energized, and cannot be started while work is performed. (Wright JA0086:21-JA0087:13). The "lock-out" portion of LOTOTO refers to placing a lock on the breaker. (Wright JA0086:21-JA0087:13). The "tag-out" portion refers to recording information on a tag which is placed on the lock, such as the time and the employees' name. (Wright JA0086:21-JA0087:13). "Try-out," refers to asking the plant operator to attempt to start the equipment to ensure it is de-energized. (Wright JA0086:21-JA0087:13).

The Company insists that per company-wide rules, any time a guard is removed while working on a piece of equipment, an employee is required to complete LOTOTO. As discussed below, the actual practice at the Millville location differed significantly from such written policies. Testimony from several long-tenured employees at the Millville Plant demonstrates that the Company did not in fact require LOTOTO each time a guard is removed, particularly when performing work on conveyer belts.

7

Specifically, forty-year employee and Plant Operator James Osborne ("Osborne") testified that the Company's enforcement of its LOTOTO rules have changed drastically since the termination of the discriminatees in this matter. Osborne explained that prior to the terminations, management and supervisors were focused only on production. (Osborne JA0458:9-23). As a result, supervisors would often instruct employees to take shortcuts or ignore safety rules, even when it came to LOTOTO. (Osborne JA0458:9-23). Osborne testified that he witnessed on multiple occasions employees work to track a belt with the guards removed,[2] with the belt running, and without completing LOTOTO. (Osborne JA0457:8-JA0458:7). Osborne testified that it was common at the Millville Plant to work on conveyor belts with the guards removed and the belt running, and that it was a "normal thing" that he had "seen thirty-five (35) years of." (Osborne JA0457:8-JA0458:7).

Osborne testified that he himself had been caught on several occasions working on equipment without performing LOTOTO. (Osborne JA0397:13-JA0398:3; JA0417:1-16; JA0418:1-9). Osborne testified that he was never disciplined on those occasions, and that instead he was simployly told to go LOTOTO and return to work. (Osborne JA0397:13-JA0398:3; JA0417:1-16; JA0418:1-9).

---

[2] As discussed herein, this is the work the Discriminatees were performing that allegedly lead to their termination.

Osborne testified that he isn't aware of any other individuals who have been disciplined for violating LOTOTO, and testified that terminations were rare overall. (Osborne JA0405:14-21). Osborne testified that as a result, he was "very surprised" by the terminations of the Discriminatees. (Osborne JA0414:8-17).

Rutherford similarly testified that the Company's enforcement of LOTOTO changed significantly since termination of the Discriminatees, and that the rules concerning LOTOTO before and after the terminations were "night and day." (JA0321:28-JA0322:06). In fact, Rutherford testified that he wasn't even provided a lock until after the termination of the Discriminatees. (Rutherford JA0322:13-24).

Molina similarly testified that in his sixteen years of experience, the Company did not previously require employees to complete LOTOTO any time a guard was removed. Molina testified that supervisors and managers were primarily concerned about production, and would routinely ignore safety procedures or even instruct individuals to perform tasks contrary to written procedures. (Molina JA0230:12-21). Molina testified that especially when working under Supervisor Mills, there was always a concern about "numbers and production," and that Supervisor Mills' routinely told employees "I don't see nothing, I don't know nothing." (Molina JA0230:12-JA0231:5). Molina testified that in his sixteen (16) years of employment at the Millville Plant, he had tracked belts before without locking out, even if guards

were removed during the process, and had never previously been disciplined for doing so. (Molina JA0226:18-JA0227:8; JA0228:9-12).

Alberto similarly testified that the Company did not require individuals to perform LOTOTO while tracking a belt prior to his termination. (Alberto JA0604:19-JA0606:25). Alberto testified that in practice, LOTOTO was only required when work was going to be performed inside of the guarded area, and that in other instances, LOTOTO would not be required, even if guards were removed. (Alberto JA0604:19-JA0606:25). Alberto testified that management was primarily concerned about production, and supervisors were aware that employees would perform tasks such as track belts without performing LOTOTO. (Alberto JA0606:17-18). Alberto also testified that just a few weeks prior to his termination, Supervisor Mills saw Alberto performing work on a piece of equipment with the guards removed and without his lock in place, but said nothing. (Alberto JA0607:1-23).

Each of the above individuals explained that LOTOTO was specifically not required when tracking a belt, and that in their experience, there was no way to track a belt without the belt running.[3] (Molina JA0227:1-10; Osborne JA0414:1-16; Alberto JA0601:12-JA0602:5). Specifically, Osborne testified that when tracking a

---

[3] As explained in detail below, tracking a belt is a process in which the conveyer belt is steered to prevent material from falling over the sides. (Molina JA212:1-12)

belt, you would need to run the belt during the process to adjust it, which would sometimes occur with the guards off.[4] (Osborne JA0420:1-18).

This is supported by the Company's own statement in a written warning to another employee involved in a separate LOTOTO incident, which states that "[a]lthough the belt may be [tracked] without being energized, past practice has been to energize the belt during the process." (JA1676).

Consistent with the above testimony, before the terminations at issue here, there is no evidence of *one single instance of prior discipline* for a LOTOTO violation at the Millville Plant. (JA1555).

### 2. On June 28, 2019, The Discriminatee Performed His Duties According to the Established LOTOTO Procedures and Practice at the Millville Plant

On June 28, 2019, Molina was working with coworker Alberto as maintenance on the second shift. During the shift, one of the conveyer belts which was used for moving material around the sand portion of the plant broke down. (Alberto JA0614:2-13; Mills JA0948:20-21; JA1011:13-16). As a result, the plant was shut down. (Mills JA1011:13-25). In order to get the plant running, Supervisor Mills instructed Molina and Alberto to track the M25 conveyer belt, which had been out of commission for some time. (Molina JA0211:6-18). As Supervisor Mills

---

[4] Because locking out a belt involves cutting off the power to the belt, a belt is not able to run while it is locked out.

testified, if the work was completed on the M25 in time, the plant would have been started back up, and production would have resumed. (Mills JA1011:13-25).

Tracking a conveyor belt is a routine maintenance function which involves steering the conveyer belt so that it runs over the center of the rollers, so that material does not run off the side of the belt. (Molina JA0212:1-12). Molina testified that tracking a belt is a routine task that he had performed over a thousand times during his employment. (Molina JA0213:17-JA0214:14).

In order to track a belt, employees would first attempt to hit the rollers under the belt to guide the direction of the belt. (Mills JA0946:18-22). During this process, the belt would need to be moving so that the belt could be steered, and to ensure that the belt was not overcorrected. (Molina JA0213:18-21; JA0227:1-8; Osborne JA0420:1-16; Alberto JA0601:12-JA0602:5). Because the belt needs to be running during this process, LOTOTO could not be completed when hitting the rollers to track the belt. (Mills JA0946:18-JA0947:6).

If hitting the rollers doesn't work to track a belt, some belts can be adjusted by turning an adjustment bolt on the bottom section of the belt (the "tail pulley"). (Mills JA0947:8-24). The tail pulley is surrounded by a cage (or guards), but on most belts, there are two adjustment bolts that are accessible from outside of the guarded area which move the entire tail pulley section backwards or forwards. (Mills JA0947:8-24). On the M25 conveyer belt specifically, the adjustment bolt is

accessible from outside of the guarded area with an impact or socket wrench. (Harmon JA0910:13-24; JA0947:8-24). As explained by Supervisor Mills and Harmon, per the Company's policies, this process can be completed without performing LOTOTO. (Harmon JA0910:13-24; Mills JA0947:8-24).

On June 28, 2019, Alberto and Molina first attempted to track the M25 belt by hitting the rollers. (Molina JA0212:1-12; JA0264:2-7). During this process, as Alberto and Molina testified during the hearing, as well as explained to the investigators as set forth in the interview notes, one of the guards that had previously been damaged fell off the tail pulley of the M25. (Molina JA0264:2-7; JA0910:21-JA0911:2; JA1422; JA1911).

After hitting the rollers didn't work, Alberto and Molina attempted to use the adjustment bolts on the tail pulley of the M25. (Molina JA0265:9-17). Alberto and Molina did not initially complete a LOTOTO at this point, and, as explained above, were not usually required to per the long-standing practice at the Millville Plant.

As explained during their testimony and during the interviews with Company investigators, Alberto and Molina were unable to move the adjustment bolt of the M25. (Molina JA0265:9-17; JA1422; JA1911). The Discriminatees then attempted to use a torch to heat the bolt to break it free. (Molina JA0265:9-17; JA1422;

13

JA1911). [5] While it is not always necessary to use a torch to loosen the adjustment

bolt, it is not unusual. (Mills JA1007:22-JA1008:8).

Supervisor Mills arrived at the M25 while Molina was working with another

employee, Thomas Johns, and was using a torch and impact on the adjustment bolt.

(Mills JA0955:11-14). Supervisor Mills took a picture of the work being performed.

(Mills JA0955:11-14).

There was a dispute during the hearing as to what exactly was said between

Supervisor Mills and Molina when Mills arrived at the M25. Based on Molina's

testimony, he explained to Supervisor Mills that they were unable to loosen the

adjustment bolt with the torch, and determined that in order to track the belt, they

would need to get inside the tail pulley, cut the adjustment bolt, and use a chain jack

to pull the entire tail pulley assembly back, which meant they needed to perform a

LOTOTO to continue work. (Molina JA0217:11-18). Supervisor Mills, on the other

hand, testified that he told Molina and Johns to stop working to perform LOTOTO.

(Mills JA0958:7-13).

---

[5] At some point during this process, Johns was instructed to take the water truck
over to the M25 to clean material off of the "runway. (Johns JA0508:6-14). Johns
was also instructed to use a loader to fill in a hole at the back of the tail pulley that
had filled up with water, so that Molina and Alberto could work on the tail pulley
without standing in the water.  (Johns JA0508:15-22). After filling in the hole,
Johns briefly assisted Molina using a torch to heat the adjustment bolt. (Johns
JA0509:2-7).

14

Regardless, it is undisputed that after the conversation with Mills, Alberto and Molina drove to the control tower to perform LOTOTO. (Mills JA0959:7-10).

Molina testified that after locking out, he and Alberto returned to the M25, removed the top guard from the tail pulley, cut the adjustment bolt, and used a chain jack to pull the tail assembly backwards. (Molina JA0273:4-8; JA0276:3-13). Using this procedure, they were able to successfully track the M25, and were assigned to work on another piece of equipment before the end of their shift. (Molina JA0218:1-16).

Supervisor Mills testified that when he arrived at the M25, none of the three employees acted surprised to see him there, did not attempt to stop what they were doing when he arrived, and did not seem worried that he saw what they were doing. (JA1008:24-JA1009:13).

Both Alberto and Molina testified that the process they used to track the M25 was the same process that they had always used in similar situations, and that they did it the way they were trained to do the job. (Molina JA0217:19-25; Alberto JA0615:1-8).

### 3.    Curtis Mills' Documented and Reported the M25 Incident to Upper Management

Supervisor Mills was informed of a possible LOTOTO violation during work on the M25 by his son, C.W. Mills. (C.W. Mills JA0789:7-15; JA0796:1-17). After C.W. spoke with Supervisor Mills, C.W. sent a text and had a phone call with

Wright. (Wright JA0089:19-JA0084:14; C.W. Mills JA 0797:3-11; JA1289; JA1291). C.W. Mills indicated the call took approximately thirty seconds, and he only stated to Wright that there was a possible LOTOTO violation, which Supervisor Mills was handling. (Wright JA0089:19-JA0084:14; C.W. Mills JA 0797:3-11; JA1289; JA1291). Wright told C.W. to have Supervisor Mills call him once it was handled. (Wright JA0089:9-14).

After speaking to C.W. Mills, instead of contacting the individuals on the radio to stop work, Supervisor Mills went to the control tower to take pictures showing that there were no locks in place. (Mills JA0985:5-23). Supervisor Mills then drove over to the M25 to take pictures of employees working on the M25. (Mills JA0985:5-23). Supervisor Mills sent those pictures to Wright, which is something he had never done before. (Wright JA0090:1-10; Mills JA0988:1-14). Supervisor Mills then reported the incident in a phone call with Wright. (Wright JA0090:15-23).

Supervisor Mills had never previously documented a suspected violation of a safety rule in this manner, had never taken pictures of individuals violating any rule at the plant before, and had never previously reported a safety violation in this manner. (Mills JA0986:5-JA0988:14). Safety Director Jeff Harmon testified that this is not how he would have preferred the situation have been handled, and instead

16

would have liked to have seen the work stopped immediately. (Harmon JA0907:2-24).

### 4.    Disciplinary Interviews and Termination of Discriminatee

Prior to leaving at the end of their shift, Alberto, Molina, and Johns were never told that there was an issue with the work that they had performed on the M25. (Molina JA0218:22-25; Johns JA0510:13-18; JA0616:20-23). All three employees were allowed to finish their shift, and Alberto was even requested to stay late on the third shift. (C.W. JA1029:1-8).

Molina and Johns were suspended the following morning. (Molina JA0218:1-18; Johns JA0510:19-25). Wright testified that prior to suspending the employees, he called Bottom to discuss the incident because he was unsure how to proceed. (Wright JA1148:5-15). During this conversation, Bottom told Wright that all employees involved needed to be suspended, and that an investigation needed to occur. (Wright JA1148:5-15).

Molina and Johns were thereafter called into interviews the following Tuesday. Harmon took notes of the interviews, and the interviews were recorded. (JA1418; JA1420). Present for the Company was Harmon, Wright, and Charl Marais, who is the Operations Manager for a separate division of Lafarge Holcim. (Harmon JA0848:19-JA0849:5). Harmon testified that, although Bottom would usually have been a part of the investigation, he and Wright decided to bring in Charl

17

Marais because they were concerned that Bottom was involved in the Company's anti-union campaign, and they wanted to appear neutral. (Harmon JA0848:19-JA0849:5).

During Molina's interview, he explained the work that was performed on the M25, both before and after the M25 was locked out. (JA1418; JA1596:9-JA1597:13). Molina explained that before LOTOTO was performed, they had tried beating the rollers and using the adjustment bolt on the bottom of the frame, which was accessible from outside of the guards. (JA1418; JA1596:9-JA1597:13). Molina additionally explained that after they determined that they were going to have to get inside the guards to cut the bolt and use the chain jack to move the tail pulley back, and that prior to performing that task, LOTOTO was completed. (JA1418; JA1596:9-JA1597:13). This is consistent with Molina's testimony at the hearing as well as his statements during the interview on July 2, 2019, and this is the way he had always performed this task. (JA1596:9-JA1597:13).

After the initial interviews on July 2, 2019, each of the three were called into follow-up interviews on July 9, 2019. (JA1911; JA1914; JA1427). During Molina's follow-up interview, he again explained the tasks that were performed prior to LOTOTO being performed as well as after LOTOTO was performed. (JA1911). Molina's responses were consistent in both interviews, stating that they performed a LOTOTO once they determined that they needed to get inside the guarded area to

18

cut the adjustment bolt and use a chain jack to move the tail pulley back. (JA1911). The notes taken during Alberto's interview are also consistent with the above version of events. (JA1422).

Shortly thereafter, Molina, Johns, and Alberto were terminated.[6] Per the termination letters, the Discriminatees were terminated for violation of the Company's LOTOTO procedures, by removing guards without first performing a LOTOTO. (JA1496; JA1499; JA1502). While Johns' termination letter specifically states that the Company believed that he was not truthful in his interviews with management, the termination letters for Molina and Alberto do not include any reference to dishonesty during the investigation. (Collins JA0764:25-JA0765:7; JA1496; JA1499; JA1502). Collins testified that Johns' dishonesty during the investigation would not alone have justified discharge for Johns absent the alleged safety violations, and that it would "depend on the circumstances." (Collins JA0765:11-18).

**5**.    **C.W. Receives only a Written Warning for a July 2019 LOTOTO Violation**

Less than a month following the June 28, 2019 incident, Millville had its second ever recorded LOTOTO violation. (Wright JA0098:23-JA0099:1). Wright explained that the incident involved a contractor working under the direction of C.W.

---

[6] While the initial charges and Board Order relate to the termination of all three employees, at this time a remedy is sought only for the termination of Molina.

Mills. (Wright JA0099:4-9). C.W. was supervising the contractor while the contractor was tracking a conveyor belt. (Wright JA0115:24-JA0116:12; JA1676).

Osborne witnessed the contractor working on the belt, while the belt was energized, without the guards in place. (Osborne JA0409:10-JA411:17). Osborne testified that this wasn't uncommon, but that he believed that C.W. and the contractor were doing the same thing that allegedly led to the termination of Molina, and that it was "against company policy after Joe [Molina] got fired." (Osborne JA0409:10-JA411:17). As a result, Osborne reported the incident. (Osborne JA0409:10-JA411:17). Osborne testified that had this happened prior Molina's termination0, he would not have reported the incident. (T. Osborne JA0410:6-9).

The Company's investigation notes for the incident indicate that the contractor had received site-specific LOTOTO training from a supervisor at the Millville Plant. (JA1509; Harmon JA0912:8-JA0913:13). Wright further testified that C.W. instructed the contractor to perform the work, and instructed the contractor how to perform the work. (Wright JA0115:24-JA0116:12). This is consistent with the investigation notes, in which the contractor indicated that C.W. discussed the procedure regarding LOTOTO and how to track the belt. (JA1509). The Company's investigation notes state that during the investigation, the contractor stated that he had tracked belts before, and that he "[didn't] understand how you [track] a belt without it running," because it "needs to have a load on to do it right." (JA1509).

20

Despite the fact that C.W. instructed the contractor to perform the work, instructed the contractor how to perform the work, and reenergized the conveyor belt while the guards were removed from the tail pulley, C.W. received only a written warning for his violation of this supposedly "zero tolerance" rule. (Harmon JA0913:19-JA0914:8; JA1676).

## V. The Company Subsequently Changed Enforcement of its LOTOTO Policies and held Retraining Sessions

Following termination of the Discriminatees, the Company held retraining sessions concerning LOTOTO, despite the fact that LOTOTO was apparently discussed at the Company's Annual Refresher earlier that year. In July 2019, approximately a week after the termination of the discriminatees, Wright and Harmon held a safety meeting with all three shifts to retrain employees regarding proper LOTOTO procedures. (Wright JA0094:10-25; Rutherford JA0326:3-9; JA0327:7-21).

Rutherford testified that shortly following the terminations here, Wright was involved in a retraining of employees on proper LOTOTO procedures after another conveyor belt broke down. (Rutherford JA0322:19-21). According to Rutherford's testimony, Wright had to train employees regarding the appropriate LOTOTO procedures, including what equipment to lock out, how to properly install the lock boxes, and how to properly log the lock out. (Rutherford JA0320:10-24). Rutherford testified that prior to the terminations, installing or splicing a new belt would take

21

approximately three (3) hours; however, because the maintenance employees needed to be retrained as to the proper LOTOTO procedures, replacing the belt took a total of fourteen (14) hours. (Rutherford JA0325:1-13).

Enforcement of the Company's LOTOTO procedures changed significantly following the terminations of Discriminatees. Rutherford and Osborne testified that equipment must now be locked out any time that a guard is removed, which was not how the rule was enforced prior to the terminations. (Rutherford JA0320:12-13; JA0321:18-24; JA0322:1-8; JA0371:20-23; Osborne JA0456:8-15; JA0459:3-7)

Similarly, Wright explained that prior to termination of the Discriminatees, it was permissible to hit the rollers of a conveyer belt while tracking a belt, without being locked out, but that since the terminations, that was no longer permissible. (Wright JA0105:17-25; JA0107:9-15). This is consistent with the testimony of Osborne, who stated that while before, employees were not required to LOTOTO throughout the whole process of tracking a belt, the rules and procedures changed, with employees now being required to LOTOTO at the beginning of the process, and remain locked out throughout the repair. (Osborne JA0420:1-16; JA0459:1-5).

Overall, Osborne testified that following the termination of the Discriminatees, routine maintenance tasks take much longer to perform, due to the changes in the way in which the Company has enforced its safety policies. (Osborne JA0403:11-20).

22

## VI.    The Board's Conclusions and Order

Based on the above facts, the Board, adopting the findings of the Administrative Law Judge ("ALJ"), found that the Company violated Section 8(a)(1) of the Act by creating the impression that employees' union activities were under surveillance and threatening employees with unspecified reprisals if they selected the Union as their bargaining representative, via statements made by Supervisor Mills. (Order JA1891) Specifically, the Board found that on multiple occasions, Supervisor Mills told second-shift employees that the Company knew that they were the "troublemakers" behind the union's organizing campaign, and stated one week prior to the election that he "only had to be nice for one more week." (Order JA1891).

The Board additionally found that the Company violated Section 8(a)(1) of the Act via Bottoms' coercive interrogation of employees about their union sympathies and how they intended to vote in the upcoming election. (Order JA1891-1892).

The Board additionally found that the Company violated the Act by failing to adhere to standards for questioning and in preparation for a hearing as set forth in *Johnnie's Poultry*, 146 NLRB 770 (1964). (Order JA1891-1892).

The Board further found, applying the standard set forth in *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir.), that the Company violated the Act

23

in terminating Molina. (Order JA1892). The Board found that the General Counsel proved that Molina was engaged in protected union activity, and that the Company was aware of such activity. (Order JA1892). The Board further found that the General Counsel proved that animus towards such protected activity was a motivating factor in the Company's decision to discharge him, relying on the timing of the discharge in relation to the election and related protected activity, disparate treatment demonstrated by enforcement against Molina of a frequently violated safety policy that had not been enforced at the Millville Plant on any single prior occasion, and the unlawful conduct and Company statements evincing antiunion hostility. (Order JA1892).

The Board further found that the Company failed to meet its burden in proving that it would have discharged Molina absent his union activities and support, demonstrated by the disparate treatment of Molina for violating a rule which had never before been enforced in that manner at the Millville Plant. Despite the fact that the final decision to discharge Molina was purportedly performed by an "impartial" corporate review team, the Board held that the anti-union animus of Supervisor Mills, which motivated his documentation and report of the alleged violation, was properly imputed to the final decisionmaker. (Order JA1892).

Based on the above violations, the Board ordered that the Discriminatees be offered reinstatement, and made whole for any loss of earnings and other benefits. (Order JA1893).

## SUMMARY OF ARGUMENT

Under the highly deferential standards that restrict this Court's review, the Board's findings and Order should be enforced. Substantial evidence supports the Board's conclusions that the Company, by its supervisors and members of management, made statements which gave bargaining unit members the impression that their union activities were under surveillance, and which constituted threats of unspecified reprisals should employees support the Union, in violation of Section 8(a)(1) of the Act. Such statements include statements made by Supervisor Mills to the Discriminatees that the Company knew that they were the "troublemakers" that were "pulling the train" for the Union organizing campaign, and that he only had to be nice to employees "for one more week" approximately one week before the election. Because such statements could reasonably be interpreted by employees as a threat of reprisal for their protected activities, and that the Company was keeping tabs on their union activities, such statements violate Section 8(a)(1) of the Act.

Substantial evidence also supports the Board's conclusions that the Company, via Bottom, engaged in unlawful interrogations of bargaining unit members

concerning how they intended to vote in the representation election, in violation of Section 8(a)(1) of the Act.

Substantial evidence further supports the Board's conclusions that Molina's termination violated Section 8(a)(3) and (1) of the Act.

Multiple factors, including the timing of the discharge, the discriminatory enforcement of safety rules, and the anti-union animus demonstrated by Supervisor Mills, who documented and reported the alleged violation, support the findings that the termination was motivated by anti-union animus.

Furthermore, substantial evidence in the record supports the findings that the Company had never once applied its safety rules in this manner prior to terminating Molina. In fact, the Company is unable to provide *one single example* of disciplining an employee at its Millville location for the conduct at issue here, despite the fact that credible testimony demonstrates that supervisors were aware of similar incidents on multiple prior occasions. In fact, testimony from long-tenured employees demonstrates that supervisors, including Supervisor Mills, *actively encouraged* employees to cut corners on its LOTOTO procedures. Because the Company seemingly only took issue with this conduct *after* its employees took action to organize a union, substantial evidence supports the Board's findings that the Company failed to meet its burden of proving that it would have discharged the Discriminatees absent their protected activity. Thus, substantial evidence supports

the Board's findings that the Company violated Section 8(a)(3) of the Act by terminating Molina.

## STANDARD OF REVIEW

This Court's review of a Board order is limited. *Tecnocap, LLC v. NLRB*, 1 F.4th 304, 312-313 (4th Cir. 2021). Courts must "uphold the NLRB's findings of facts if they are supported by substantial evidence considering the record as a whole." *Id*. (citing *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 838 (4th Cir. 2000)). This is the case even if the reviewing court "might have reached a different result had [it] heard the evidence in the first instance." *Alpo Petfoods, Inc. v. NLRB*, 126 F.3d 246 (4th Cir. 1997) (citing *NLRB v. General Wood Preserving Co.*, 905 F.2d 803, 810 (4th Cir. 1990) *cert. denied*, 498 U.S. 1016 (1990)). In other words, a reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 405 (1962)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *See also NLRB v. Danial Cons. Co.*, 731 F.2d 191, 193 (4th Cir. 1984)("If the findings of the Board have substantial support in the record as a whole, our inquiry ends and its order must be enforced even though we might have reached a different result had we heard the evidence in the first instance.").

This court has held that "substantial evidence" is evidence which "a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *NLRB v. Air Contact Transp. Inc.*, 403 F.3d 206, 210 (4th Cir. 2005)). While the Board's conclusions may not be based on "pure speculation," the Board is entitled to draw "reasonable inferences from the evidence." *Owens-Corning Fiberglass Corp. v. NLRB*, 407 F.2d 1357, 1362 (4th Cir. 1969). The court must "accord due deference to the reasonable inferences that the Board draws from the evidence." *Grinnell Fire Protection Sys. Co. v. NLRB*, 236 F.3d 187, 195 (4th Cir. 2000).

Additionally, in determining whether credibility determinations are supported by "substantial evidence", courts "defer to the credibility findings of the ALJ unless faced with extraordinary circumstances." *NLRB v. Transpersonnel, Inc.*, 349 F.3d 175, 184 (4th Cir. 2003).

Courts also give great deference to the Board's interpretations of the NLRA. *See, e.g. Indus. TurnAround Corp. v. NLRB*, 115 F.3d 248, 251 (4th Cir. 1997) (noting that courts "must defer to the NLRB's interpretation of the NLRA if it is reasonably defensible."). This deference arises from the fact that under the statutory framework established by Congress, "the NLRB has primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific., Inc.*, 494 U.S. 775, 786 (1990).

Courts further give broad deference to the remedy selected by the Board. *See, e.g., NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346 (1953). The Board's chosen remedy must be enforced "unless it is arbitrary, capricious, or manifestly contrary to the statute." *Coronet Foods, Inc. v. NLRB*, 158 F.3d 782, 788 (4th Cir. 1998) (internal quotations removed). The Board is expressly authorized under the statute to order the reinstatement of improperly discharged discriminatees, and to award back pay to such discriminatees. 29 U.S.C. § 160(c).

## ARGUMENT

**I.    Substantial Evidence Supports the Board's Findings that the Company Violated Section 8(a)(1) of the Act via statements made by Supervisor Mills, which Constituted Threats of Unspecified Reprisals and which Gave Employees the Impression that their Union Activities and Support were under Surveillance.**

Substantial evidence supports the Board's findings that Supervisor Mills' statements in the weeks leading up to the election that second shift employees were "troublemakers" behind the organizing effort, and that he only had to be nice "for one more week" violated Section 8(a)(1) of the Act, in that they created the impression that employees' union activities or support were under surveillance, and constituted unspecified threats of reprisal for employees' protected concerted activity.

Section 8(a)(1) of the Act makes it "an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of" their rights to

29

organize, collectively bargain, and engage in similar concerted activities. 29 U.S.C. § 158(a)(1). Statements by an employer that create the impression that union activities are under surveillance violate Section 8(a)(1) of the Act, as such statements tend to inhibit employees' exercise of their rights. *Robert F. Kennedy Medical Center*, 332 NLRB 1536, 1539-40 (2000). Such statements are evaluated from the perspective of employees, and are unlawful if the employees could reasonably conclude from the statements that their union activities were being monitored. *Id*.

Similarly, when evaluating whether a statement may constitute a threat of unspecified reprisal in violation of the Act, an objective standard is used, to analyze whether the statement at issue would reasonably tend to interfere with the free exercise of employee rights. *Diva Carina Bay Resort*, 356 NLRB 316, 219 (2010).

Substantial evidence in the record exists to demonstrate that Supervisor Mills told the Discriminatees that the Company knew that second shift employees were the leaders of the organizing effort. Both Molina and Alberto testified concerning a conversation with Mills that occurred near the dust pile at the quarry, shortly before the election, in which Mills stated that second shift was "pulling the train" and were the "troublemakers" behind the union organizational effort. (Molina JA0199:8-15; Alberto JA0597:11-21).

Because employees could reasonably conclude from the above statements that their Union activities were under surveillance, the statements violate Section 8(a)(1)

of the Act. *George L. Mee Memorial Hosp.*, 348 NLRB 327, 342-343 (2006)(holding that employees would reasonably conclude that their union activities were under surveillance from employer's comments that an employee was the "ringleader" of the union effort).

Additionally, substantial evidence supports the finding that Supervisor Mills made the statement that he "only had to be nice for one more week" approximately one week before the election. Mills denied making this statement in his sworn affidavit to the Region, but during trial, indicated that he "may" have made the statement, but if he did, it was because he knew he was going to be demoted. (Mills JA0942:1-5; JA977:2-4). However, Rutherford testified that he understood the statement, given that the statement was made in connection with other statements concerning the Union, to mean that if the Union were elected, than there would be retaliation against employees. (Rutherford JA0385:1-20).

Because substantial evidence supports the findings that employees could reasonably interpret the above statement as a threat of reprisal, particularly given the timing of such statements, and the context in which such statements were made, such statements violate Section 8(a)(1) of the Act. Thus, the Board did not err in adopting the ALJ's findings regarding such statements.

The Company argues that the above findings are erroneous, because it relies on testimony from Rutherford and Alberto. The Company argues that Alberto was

not a credible witness, and that Rutherford's testimony is not relevant to the issue in the complaint, because he was allegedly describing an incident that happened before the June 2019 petition was filed. (Co. Br. 56).

The credibility arguments raised by the Company concerning Alberto and Molina are discussed in greater detail in Section V below.

That said, in this instance, the ALJ gave specific reasoning for crediting the testimony of the Discriminatees on this issue over that of Mills, noting that the testimony of each of the employees was consistent and generally corroborative of each other, and relying partially upon *Mills' own admission* that he may have made the statements at issue. (Mills JA0982:20-23). As pointed out during cross examination, such admission was in direct contradiction to Mills' sworn affidavit given to the investigating agent. (Mills JA0981:3-22).

Furthermore, the Company's argument misrepresents Rutherford's testimony. While in his affidavit, Rutherford described conversations in which Mills made coercive statements in 2018, Rutherford confirmed on cross examination that he and Mills had several conversations about union organizing efforts leading up to the campaign, that the last conversation occurred approximately a week before the election, and that it was during this conversation in that Mills indicated he "only had to be nice for one more week." (Rutherford JA0358:13-17; JA0385:3-20). Thusm substantial evidence supports the Board's findings in this regard.

## II.   Substantial Evidence Supports the Boards Findings that the Company Violated Section 8(a)(1) of the Act via Unlawful Interrogations of Employees Concerning Their Union Sympathies and Support.

The Board applies a totality of the circumstances test in evaluating whether an employer's questioning of an employee reasonably tends to restrain, coerce, or interfere with employees in the exercise of their Section 7 rights. *Rossmore House*, 269 NLRB 1176, 1177 (1984). Relevant factors include the nature of the information sought, the identity of the interrogator, the place and method of the interrogation, the truthfulness of the interrogated employee, and the employer's history of hostility towards union activity. *Id*. Untruthful answers provided in an attempt to conceal union support weigh in favor of finding the questioning unlawful. *Camaco Lorain Mfg. Plant*, 356 NLRB 1182, 1183 (2011).

The Board "jealously guards" the secrecy of the voting booth, and specific questions about how an employee intends to vote violates Section 8(a)(1) of the Act. *Royal Laundry*, 277 NLRB 820, 830 (1985).

Both Johns and Alberto testified that during one-on-one conversations, Bottoms asked them about their union sympathies. (Johns JA0504:17-JA0505:4; Alberto JA0593:11-25; JA0594:3-7).

With respect to Johns, the conversation occurred during a ride-along, in which Bottoms discussed the negative impacts of unionizing, asked Johns whether he knew anyone in a union, and how he felt about the Union. Bottoms testified that the

33

conversation took 15 to 20 minutes, while Johns believed it felt like over an hour. (Johns JA0504:1-16). Multiple factors, including Bottom's position with the Company, Johns' inability to end the conversation, Johns' unfamiliarity with Bottoms, Bottom's remarks concerning unionization, and Bottom's point blank question about how Johns "felt" about the Union provide substantial evidence supporting the finding that the questioning constituted an unlawful interrogation.

The Company argues that Johns did not testify that Bottoms asked how he was going to vote, but rather "how he felt" about the Union. (Company Br. 54). This is a distinction without a difference, and is a misstatement of the law. The law does not require any particular magic words for an interrogation to violate the Act; rather, the totality of the circumstances of the questioning is relevant. Given the above testimony, substantial evidence supports the Board's decision that the questioning violated the Act.

Alberto similarly testified that Bottom, in a similar one-on-one conversation, specifically asked him how he intended to vote, with Alberto replying that he had his "mind made up." (Alberto JA0593:11-25; JA0594:3-7). The Company's only argument with regard to the findings related to this conversation is that the Board and ALJ erred in crediting the testimony of Alberto, alleging vaguely that he is a "proven liar." (Company Br. P. 54) The Company's credibility arguments concerning Alberto are discussed in Section V below.

34

Furthermore, even if, assuming *arguendo*, this Court were to find that the Board and ALJ erred in crediting the testimony of Alberto in this regard, the questioning of Johns independently constitutes a violation of Section 8(a)(1), and thus, this Court should enforce the Board's findings and order.

### III. Substantial Evidence Supports the Board's Findings that the Company Violated Sections 8(a)(1) and (3) of the Act by Terminating the Discriminatees

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" Section 7 of the Act. Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations. 29 U.S.C. § 157. An employer violates Section 8(a)(3) of the Act by discriminating "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. 29 U.S.C. § 158(a)(3).

An employer violates Section 8(a)(3) of the Act by discharging employees in discrimination or retaliation for their protected concerted activities. 29 U.S.C. 158(a)(3). An employer's adverse employment action violates Section 8(a)(3) if its actions are motivated by anti-union animus. *Alpo Petfoods, Inc.*, 126 F.3d 246 (4th Cir. 1997)*; See also WXGI, Inc. v. NLRB*, 243 F.3d 833, 839-840 (4th Cir. 2001)("Section 8(a)(3) directly protects employees against work transfers or firings due to anti-union animus.")(internal quotations omitted).

35

Under the formula established by *Wright Line*, the General Counsel must make out a prima facie case that the employer's decision to terminate the employee was motivated by anti-union animus. *FPC Holdings, Inc. v. NLRB*, 64 F.3d 935, 942 (4th Cir. 1995). To make out a prima facie case, "the General Counsel must show (1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the activity was a substantial or motivating reason for the employer's action." *Id*. Demonstrating motive may be done via "circumstantial as well as direct evidence." *Id*. This court has noted that the issue of motive is a "factual issue which the expertise of the Board is particularly suited to determine." *Id*. The Board's determination of motive "will not be overturned if it is reasonable," so long as it is not dependent upon "mere speculation." *NLRB v. Instrument Corp. of America*, 714 F.2d 324, 328 (4th Cir. 1983).

Here, substantial evidence supports the Board's findings that the Company's termination of the Molina was motivated by anti-union animus, and thus, Molina's termination violated Sections 8(a)(3) and (1) of the Act.[7]

---

[7] The Company does not dispute that substantial evidence supports the Board's findings that Molina was engaged in activities protected under Section 7 of the Act, and that the Company had knowledge of Mr. Molina's protected union activity. (Company Br. P. 44). The Board's findings in this regard are supported by the substantial testimony provided that Molina led the organizing effort at the Plant, openly engaged in pro-union activities prior to the election, served as an observer on behalf of the Union on the date of the election, and even told members of Management of his intent to support the union and serve as the Union's observer during the election.

Substantial evidence further supports the Board's findings that the terminations of Alberto and Johns were simply to provide legitimacy to the termination of Molina, and as such, their terminations violated the Act.

### A. Substantial Evidence Supports the Board's Finding that animus towards Molina's Protected Activity was a motivating factor in the Company's decision to discharge Molina

The Company argues in its brief that the General Counsel failed to meet its burden under *Wright Line* in that it failed to demonstrate that the terminations at issue were motivated by anti-union animus, relying on the fact that an allegedly independent corporate review team made the final decision to discharge the discriminatees. This argument is without merit.

Substantial evidence supports the Board's findings that the discharge of Molina was motivated by anti-union animus. Multiple factors demonstrate animus on the part of the Company, including the timing of the discharge in relation to the election, the disparate treatment of the Discriminatees, demonstrated by enforcement of a policy which had never before been enforced in the same manner at the Millville plant, and the unlawful statements made by Mills and unlawful interrogations of bargaining unit employees by Bottom prior to the election.

### 1. Timing of the Discharges Supports the Finding of Animus

The Board's order first relies on the timing of the discharges as a factor which demonstrates animus, as the suspension of Molina took place merely one day after he served as the Union's observer in an election the Company lost. (Order JA1892).

It is well-established that discipline which occurs close in time to an employees' protected activity supports an inference that such discipline is unlawfully motivated. *Montgomery Ward & Co.*, 316 NLRB 1248, 1253 (1995); *See also Corn Brothers Inc.*, 262 NLRB 320, 325 (1982) (close proximity between an employee's protected activity and their discipline supports an inference of animus.). In some instances, "timing alone may suggest antiunion animus as a motivating factor in an employer's action." *Advanced Masonry Associates, LLC*, 366 NLRB No. 57 (2018)(citing *Inova Health System v. NLRB*, 795 F.3d 68, 82 (D.C. Cir. 2015)).

Here, the suspension and ultimate discharge began only one (1) day following the union's victory in the election, in which Molina served as the Union's observer. Furthermore, Molina engaged in significant protected activity directly before the election, including collecting authorization cards, speaking with coworkers, distributing union literature, and helping to organize meetings regarding the union. The Company does not dispute it was aware of this activity. (Company Br. p. 44). Directly before the election, Molina spoke with Bottom in a one-on-one conversation to inform him that he had his mind made up concerning how he intended to vote,

and that he had been asked by fellow employees to serve as the Union's election observer. (Bottom JA1049:17-JA0150:3).

Thus, substantial evidence supports the Board's finding that timing demonstrates that the discharges were motivated by anti-union animus. This is particularly the case when viewed in the context of the Company's independent violations of Section 8(a)(1).

### 2. The Company's 8(a)(1) Violations Supports the Findings of Animus

The Board further relied on the Company's independent violations of Section 8(a)(1) in finding that the discharges of the discriminatees were motivated by anti-union animus. (Order JA1892). Substantial evidence supports this finding.

It is well established that coercive statements and interrogations prior to an election may demonstrate animus for subsequent discharges. *See Austal USA, LLC*, 356 NLRB 363, 364 (2010) (finding that employer's statements to employee that indicated animus towards employee's protected activity established unlawful discriminatory motive); *See also Colonial Parking*, 363 NLRB No. 90 (2016) (finding that unlawful threats of reprisal to a union supporter that was subsequently discharged demonstrated knowledge of the employees' protected activity, and further revealed animus on the part of employer).

Such statements may be "particularly probative" when they directly involve the individuals that are ultimately discharged. *See Advanced Masonry Associates,*

*LLC*, 366 NLRB No. 57 (2018) (finding that an employer's threat which violated 8(a)(1) was "particularly probative of [the employer's] animus" because it was challenged by the discriminatee, and because the supervisor that made the threat was later involved in the decision to discharge the discriminatee).

As discussed above, the coercive statements made by Supervisor Mills were made directly to Molina and Alberto. Specifically, Supervisor Mills' statement to Alberto and Molina that he knew they were "troublemakers," that the second shift was "pulling the train" demonstrates not only a general anti-union animus, but animus specifically to the union activities of Molina. Similarly, Bottom's unlawful interrogations of employees shortly before the election demonstrate the Company's animus.

This conduct is particularly probative in this matter, because, as discussed below, it was Supervisor Mills who documented and reported the alleged LOTOTO violation to upper management, and Bottom who instructed Wright to suspend the Discriminatees and initiate an investigation. Thus, the Board's findings that the Company's independent violations of 8(a)(1), via statements made by Mills and Bottoms, which both acted to initiate the discipline in this matter, is supported by substantial evidence.

### 3. Disparate Treatment of the Discriminatees Supports the Findings of Animus

The Board additionally relied on the Company's discriminatory enforcement of its LOTOTO and machine guarding policies to demonstrate that Molina's termination was motived by antiunion animus. (Order JA1892).

An employer's disparate or inconsistent treatment of employees supports an inference of animus and unlawful motivation, such as when an employer has long tolerated conduct which the employer alleges is the reason for the discharge of employees. *Montgomery Ward & Co.,* 316 NLRB 1248, 1253 (1995); *See also Cadbury Beverages v. NLRB*, 160 F.3d 24 (D.C. Cir. 1979) (employee fired for changing lunch schedule where written policy against doing so previously never enforced); *NLRB v. Thermon Heat Tracing Servs.*, 143 F.3d 181 (5th Cir. 1998) (discriminatorily enforcing safety rule against union supporters found to support finding of animus).

Even when the rules at issue are safety rules mandated by federal regulation, the Board has found that a Company's inconsistent and discriminatory enforcement of such rules may demonstrate animus. *Advanced Masonry Associates, LLC*, 366 NLRB No. 57 (2018).

The facts of *Advanced Masonry Associates*, are substantially similar to the facts of this matter. In *Advanced Masonry Associates*, the company maintained a fall protection policy, which required its employees to wear a "full body harness with a

41

lanyard or retractor in all elevated areas not protected by guardrails." *Id*. at *12. The company's policy stated that the company had "zero tolerance" toward violations of the fall protection rules. *Id*. Training regarding the fall protection policy was given during orientation to new employees, and was also discussed during weekly "toolbox talks." *Id*. The company's fall protection rules were required by OSHA. *Id*. Shortly before an election, the company terminated two employees for failing to wear a harness as set forth in the Company's fall-protection policy, after each employees' first violation of the policy, despite the fact that there was evidence of other employees being merely suspended for their first and second violations of the policy. *Id* at *3.

Here, the overwhelming weight of the evidence demonstrates that the Company's allegedly "zero-tolerance" LOTOTO policies were not consistently enforced at its Millville location, and in fact, employees were not only allowed, but were *encouraged* to work to track belts, with guards removed, without completing a LOTOTO. This is demonstrated by the Company's own disciplinary records, as well as testimony from multiple long-term employees. Specifically Molina (JA0226:18-JA0227:8; JA0228:9-12; JA0230:12-JA0231:5), Rutherford (JA0320:12-13; JA0321:18-24; JA-322:1-8; JA0371:20-23), Alberto (JA0604:19-JA0606:25), and Osborne (JA0457:8-15; JA0459:3-7) each testified that the Company previously did

not require employees to perform a LOTOTO each time a guard was removed, particularly in the context of tracking a belt.

Osborne specifically testified that he himself had been caught by supervisors working to track a belt with the guards off without having performed a LOTOTO, and that tracking a belt with the guards off and the belt running was a "normal thing," that he had seen "35 years of" at the Millville quarry prior to the June 28 incident. (JA0457:8-15; JA0459:3-7).

According to Alberto's testimony, he was personally seen by Supervisor Mills working on a piece of equipment with guards off, without performing a LOTOTO, only a few weeks prior to the election, but was not disciplined or even talked to at that time. (JA606:1-23).

Notably, the Company's witnesses that testified regarding the Company's LOTOTO and machine guarding policies did not work at the Millville location, or had not worked there for long. Harmon, Bottom, and Lane all do not have an office at the Millville location, and are each responsible for several quarries in the same region as Millville. Wright had just started at the Millville location prior to this incident, and even admitted that in some aspects, enforcement of the LOTOTO rules had changed following the termination of the Discriminatees. (Wright JA0105:11-20).

The fact that the Company did not enforce its LOTOTO policy in this manner prior to the termination of the discriminatees here is perhaps best demonstrated by the fact that, while the Company produced several instances of discipline at other locations, it could not produce *one single instance* of prior discipline for violating these rules at the Millville location.

Additionally, only one month after this incident, Millville had its second-ever LOTOTO disciplinary incident, which was *only reported* because an employee that witnessed violation felt that the rules were not being consistently enforced. While C.W. was involved, he was merely given a written warning for his role in violating this supposed "zero tolerance" policy. (JA1676).

Discriminatory enforcement of the LOTOTO rules is further demonstrated by the fact that enforcement changed following Molina's termination. (Rutherford JA0320:12-13; JA0321:18-24; JA0321:1-8; JA0371:20-24; JA0372:1-11; Osborne JA0403:11-20).

The Company argues that at its other facilities, it has discharged individuals for violations of its LOTOTO rules. How other locations might enforce LOTOTO rules is not relevant to the issue of whether the rule was discriminatorily applied to Molina. What is relevant is how the rules were enforced at the Millville location, where Molina was actually employed. Based on the above testimony, violations similar to the one at issue here were commonplace, and even encouraged. Notably,

not even the Plant Manager knew what to do when the violation occurred, and only suspended Molina after Bottom told him to. (Wright JA1148:5-15).

It is ultimately undisputable that the Company only took issue with the LOTOTO violations at its Millville location *after* Molina engaged in protected activity. Thus, substantial evidence supports the Boards' findings and Order in this regard.

### 4. Mills' Demonstrated Animus is Properly Imputed to the Final Decision Maker

In addition to the above factors, the Board found that, Mill's anti-union animus was properly imputed to the review team which made the ultimate decision to discharge Molina. (Order JA1892). This finding is supported by substantial evidence.

It is well established that the anti-union animus of a supervisor may be imputed to an allegedly impartial decision maker in order to prevent a Company from "launder[ing] the bad motives of certain of its supervisors by forwarding a dispassionate report to a neutral superior." *C&L Systems Corp*, 299 NLRB 366, 379 (1990); *See also Parts Depot, Inc.*, 332 NLRB 670, 672 (2000), enfd. Mem. Per curiam 24 Fed. Appx. 1 (D.C. Cir. 2001) (holding that where a supervisor's anti-union animus "taints" the decision of an otherwise impartial decision maker, the employment action violates Section 8(a)(3)).

Here, the Board found, consistent with the substantial evidence set forth above, that Mills demonstrated anti-union animus, based on comments made directly to employees, including Molina, concerning his specific protected activity of attempting to bring a Union to the Millville location.

The Company argues in its brief that Mills did not report the incident to upper management. This is contrary to the substantial weight of the evidence. While C.W. first noticed that there were not locks in place, he reported the issue to Supervisor Mills. (C.W. Mills JA0796:1-17; JA1425). It was only after speaking to Supervisor Mills that C.W. sent a text message to Wright, which only asked Wright to please call him. (Wright JA0089:19-JA0084:14; C.W. Mills JA 0797:3-11) C.W. then spoke to Wright for, by his estimate, *thirty seconds*. (Wright JA0089:19-JA0084:14; C.W. Mills JA 0797:3-11; JA1289; JA1291). During the conversation, C.W. said only that there was a possible LOTOTO issue, that Supervisor Mills "was addressing it" and *that Supervisor Mills would call Wright to "let [Wright] know what was going on."* (Wright JA0089:19-JA0084:14; C.W. Mills JA 0797:3-11; JA1289; JA1291).

Mills then spoke with Wright over the phone and reported the alleged violation. (Wright JA0090:15-23). It was also Mills that sent the pictures he took to Wright via text message, which the Company relied upon in its decision to terminate the Discriminatees. (Wright JA0090:1-10; Mills JA0988:1-14). Supervisor Mills

46

had never once before sent pictures of alleged rules violations to a Plant manager, but did so here because it was worried that otherwise the individuals wouldn't be disciplined, as it would be "their word against [his]." (Wright JA0090:1-10; Mills JA0988:1-14).

Ultimately, it was Mills report and documentation of the LOTOTO which set the disciplinary process in motion. Because such report and documentation was tainted by his anti-union animus which he previously demonstrated towards Molina and other employees, such animus is properly imputed to the review team which made the decision to terminate Molina based on such report and evidence. Thus, the Company's argument that Mills did not report the incident and had no role in the discharges is without merit.

Additionally, Wright testified that the suspensions only took place after he spoke with Bottom about the incident, who instructed Wright to suspend the employees and begin the disciplinary process. (Wright JA1148:5-15). As set forth above, Bottom additionally demonstrated anti-union animus via unlawful interrogations of bargaining unit employees. Thus, even if, assuming *arguendo* that Mills' animus could not be imputed because he was not involved in the disciplinary decision, the animus of Bottom would still taint the disciplinary decision.

Furthermore, the Company greatly exaggerates the supposed neutrality of the corporate review team. While the Company intentionally left Bottom off of the

review team in order to appear neutral given his involvement in the election, (Harmon JA0848:19-JA0849:5), Wright was still on the team which made the final decision, despite the fact that Wright himself had conducted the same sort of pre-election meetings with employees as Bottom, and had also engaged in one-on-one conversations with employees to attempt to convince employees to vote against the Union. (Harmon JA0848:19-JA0849:5; Wright JA0066:16-19; JA0082:20-JA0083-3).

Lastly, the Company ignores that the Board and ALJ found that the termination decision was motivated by anti-union animus not only due to the animus demonstrated by Mills, but also via the circumstantial evidence discussed above, including the timing of the discharges and discriminatory enforcement of its LOTOTO procedures. Thus, even if *assuming arguendo*, the animus demonstrated by Mills is not properly imputed to the review team, substantial evidence supports the finding that the termination decision was motivated by anti-union animus.

## IV. Substantial Evidence Supports the Findings that the Company would not have Terminated the Discriminatees absent Molina's Protected Activity

The Company argues that the Board erroneously held that the Company failed to prove it would have discharged Molina absent his protected activity. In support of its argument, the Company points to evidence in the record demonstrating that other plants owned by the Company have treated LOTOTO violations as a "zero

tolerance" policy, and have terminated individuals at such plants for violations of LOTOTO rules. The Company's argument is without merit.

Once the General Counsel has met its burden of establishing a prima facie case, the burden then shifts to the employer to demonstrate "affirmatively that the same action would have been taken even in the absence of the employee's union activity." *NLRB v. Instrument Corp. of America*, 714 F.2d 324, 328 (4th Cir. 1983). If the employer's stated lawful reasons are "non-existent or pretextual, the defense fails." *TNT Logistics of N. Am., Inc. v. NLRB*, 413 F.3d 402, 406 (4th Cir. 2005). A reviewing court "must affirm the Board's finding of pretext as long as it is supported by substantial evidence." *NLRB v. Grand Canyon Min. Co.*, 116 F.3d 1039, 1047 (4th Cir. 1997).

Here, the Board and ALJ found that the Company's stated reason for terminating Molina to be pretextual. (Order JA1892). This finding is supported by substantial evidence in the record, and thus must be affirmed.

As discussed herein, substantial evidence in the record demonstrates that the Company did not, contrary to what any written policy may have been, and contrary to how its rules were enforced at other plants, require employees to perform LOTOTO each time a guard is removed, particularly with respect to guards removed while tracking a conveyer belt, and certainly did not treat any violation of the policy as an automatic termination. (Molina JA0210:16-JA0211:6; JA0217:20-JA0218:1;

JA0225:24-JA0226:1;    Rutherford    JA0320:12-13;    JA0321:18-20;    Osborne JA0399:19-JA0400:14; JA0401:24-JA0404:22; JA0409:11-410:10; JA0408:9-18; JA0417:18-JA0418:11; Alberto JA0604:21-25). Other employees in the past had been caught by supervisors doing the exact same thing as Molina, without facing discipline. (Osborne JA0451:8-15; JA0459 at 3-7). Osborne testified that tracking a belt with the guards off and the belt running was a "normal thing," that he had seen "35 years of" at the Millville quarry prior to the terminations. (Osborne JA0451:8-15; JA0459 at 3-7). Alberto testified that he was even personally seen by Mills working on a piece of equipment with guards off, without performing a LOTOTO, only a few weeks prior to the election. (Alberto JA0601:1-23).

The Company additionally did not treat every LOTOTO violation as "zero tolerance" even after Molina's termination. As explained above, merely a few weeks after Molina's termination, C.W. was involved in a LOTOTO violation in which he personally instructed an individual to track a belt and knowingly energized the belt with the guards removed, yet he received only a written warning for his violation. (Harmon  JA0913:19-JA0914:8;  JA1676).  Notably, C.W.'s violation was *only* reported due to an employee's concern that the rules were not being enforced in a consistent, nondiscriminatory manner. (Osborne JA0410:6-9).

While C.W.'s disciplinary letter for this incident demonstrates he was provided some leeway given that the "prior practice" of the plant, no such latitude was provided Molina. (JA1676).

Given the clear discriminatory enforcement of plant rules, particularly with respect to the subsequent LOTOTO violation in July 2019, substantial evidence supports the finding that the Company did not meet its burden in proving that it would have terminated Molina even absent his protected activity. The discipline here happened only after Mills documented and reported the alleged violation in a manner in which he had never once done before. Absent Mills' animus, the matter never would have been before the review team in the first place. Case law is clear that the Company may not "launder" the bad motives of a supervisor by claiming a supposedly neutral third party made the ultimate employment decision. *C&L Systems Corp*, 299 NLRB at 379. Doing so is contrary to the purposes of the Act, as the Act is intended to protect employees' ability to engage in protected activity, free from the threat of retaliation by their employer.

The Company's arguments that it met its burden in proving that it would have discharged Molina absent his protected activity, because there is no evidence that the review team itself demonstrated animus towards Molina are thus contrary to law and are without merit. Such argument is tantamount to requiring a showing of direct evidence of animus on the part of the final decision maker, which is a misstatement

51

of the law. This argument further ignores that the Board and ALJ found that termination decision was motivated by anti-union animus not only due to the animus demonstrated by Mills, but also via circumstantial evidence, including the timing of the discharges and discriminatory enforcement of its LOTOTO procedures.

For these reasons, substantial evidence supports the finding that the termination of Molina violated Section 8(a)(3) of the Act.

## V. The Company's Credibility Arguments are Without Merit

As discussed above, the Company argues throughout its brief that the Board erred in upholding the credibility determinations of the ALJ concerning the testimony of Molina and Alberto, asserting vaguely that both were "proven liars." The Company's arguments concerning witness credibility are without merit.

In determining whether credibility determinations are supported by "substantial evidence", courts "defer to the credibility findings of the ALJ unless faced with extraordinary circumstances." *NLRB v. Transpersonnel, Inc.*, 349 F.3d 175, 184 (4th Cir. 2003). This is because it is the ALJ that has the opportunity to observe the testimony of the witnesses, observe the witnesses' demeanor, and interject with questions The Company's vague assertion that Alberto and Molina were "caught" lying concerning the LOTOTO incident during their disciplinary interviews, even if accurate, does not rise to the level of "extraordinary

circumstances" which would justify overturning the credibility determinations of the ALJ, which were ultimately adopted by the Board.

That said, the Company's vague assertions that Alberto and Molina are "proven liars" are without merit. While the Company specifically included lying during its investigation as grounds for Johns' termination, the termination letters for Molina and Alberto include no such allegations. (Collins JA0764:25-JA0765:7; JA1496; JA1499; JA1502). The Company only began claiming that Molina and Alberto were caught lying during the Company's investigation after the two had given unfavorable testimony during these proceedings.

Furthermore, as explained in detail above, the Discriminatees were consistent in their answers to the interviewer's questions concerning what work was performed on the M25 both before and after LOTOTO was performed. Molina and Alberto testified and explained to Company investigators that before LOTOTO was performed, they first tried to bump rollers (Molina JA0212:1-12; JA0213:15-25; JA0264:2-7; JA1592:1-JA1593:17).When that did not resolve the issue, they then tried to move with adjustment bolt, and tried heating the adjustment bolt with a torch. (Molina JA0265:9-17; JA1422; JA1911; JA1592:1-JA1593:17; Alberto JA0615:18-23).

As Molina explained in his testimony and interview notes, and as confirmed during Mills' testimony, at this point Curtis Mills arrived, and LOTOTO was

53

performed after the conversation with Mills. (Molina JA0214:4-25; JA1592:1-JA1593:17; Mills JA0955:11-14; JA0959:7-10).

As consistently explained throughout the hearing, after performing LOTOTO, Molina and Alberto returned to the M25, cut the bolt and used a chain jack to pull the assembly back to track the belt. (Molina JA0273:4-8; JA0276:3-13; JA1592:1-JA1593:17).

At best, the Company can demonstrate that Molina and Alberto were mistaken about at what point a picture was taken of them by Supervisor Mills. While each indicated they believed that the picture was after LOTOTO was performed, they had no way of knowing when the picture was taken.

Regardless, the Company's credibility arguments were rejected by the ALJ and the Board. The ALJ, who observed the testimony, noted that he credited the testimony of Molina and Alberto in that such testimony was "confident and certain" and "mutually corroborative," and corroborated by other testimony and evidence. (ALJ JA1705-JA1706).

As such, because the Company has identified no extraordinary circumstances, the credibility determinations concerning the testimony of the Discriminatees should not be disturbed.

## VI.    The Board's Remedy Should be Enforced

The Company argues that the Board's remedy of backpay and reinstatement violates Section 10(c) of the Act, because Molina was discharged for cause. This argument is without merit.

The Board has broad authority under Section 10 of the NLRA to remedy unfair labor practices. *See NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346 (1953); *See also Ultrasystems Western Constructors, Inc. v. NLRB*, 18 F.3d 251, 258 (4th Cir. 1994). A reviewing court "must enforce the Board's chosen remedy unless it is arbitrary, capricious, or manifestly contrary to the statute." *Coronet Foods, Inc. v. NLRB*, 158 F.3d 782, 788 (4th Cir. 1998). The Board is "expressly authorized by statute to order the reinstatement of improperly discharged workers and to award backpay." *Id.*; *See* 29 U.S.C. § 160(c).

As set forth herein, the facts and law support the conclusion that the Company disciplined and ultimately discharged Molina, merely one day following a successful organizing campaign, in order to retaliate against Molina's protected activity of working to organize a union at his workplace. As such, his discharge was not "for cause," and thus reinstatement and back-pay are appropriate remedies, as such remedies effectuate the policies of the Act to protect employees from retaliation for engaging in activities that are explicitly protected under the Act.

The Company further argues that Molina should be denied the remedy granted by the board because he allegedly lied to the Company's investigators and lied at trial. This argument is without merit. Apart from the vague assertions by the Company, there is no indication that Molina has in any way attempted to "abuse and undermine the integrity of the Board's processes." Rather, as explained herein, Molina consistently stated to Company investigators as well as at trial that he followed what the Company's LOTOTO previous practice was, in that he did not perform work inside the guarded area of the tail pulley with a chain jack before performing a LOTOTO.

Ultimately, the Board's remedy of reinstatement and backpay is well within its statutory authority under Section 10 of the Act, and is necessary to further the purposes of the Act. The remedy should thus be enforced.

## CONCLUSION

For the above reasons, each of the Board's findings are supported by substantial evidence. Thus, the International Brotherhood of Boilermakers respectfully requests that the Court deny the petition for review of the Board's Order, and enforce such order in full, including, but not limited to, ordering full backpay and reinstatement of the Discriminatee.

Dated: January 31, 2023                    Respectfully Submitted,

                                           /s/ *Brandon E. Wood*
                                           Blake & Uhlig, P.A.

56

753 State Ave., Suite 475
Kansas City KS, 66101
(913)321-8884
bew@blake-uhlig.com

Attorneys for Intervenor

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this document contains 12,214 countable words of proportionally spaced, 14-point type, in compliance with the word limit set forth under Federal Rule of Appellate Procedure 32(a)(7(B)(i) and 32(f).

This brief is double spaced, except for headings, footnotes, and indented quotes, in compliance with Federal Rule of Appellate Procedure 32(a)(4). This Brief was typed using Microsoft Word for Office 365.

Dated: January 31, 2023                        Respectfully Submitted,

/s/ *Brandon E. Wood*
Blake & Uhlig, P.A.
753 State Ave., Suite 475
Kansas City KS, 66101
(913)321-8884
bew@blake-uhlig.com

Attorneys for Intervenor

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| BARDON, INC., d/b/a AGGREGATE INDUSTRIES | ) | |
| | ) | |
| | ) | |
| Petitioner/Cross-Respondent | ) | |
| | ) | |
| v. | ) | Case Nos.: 22-1340; |
| | ) | 22-1421 |
| NATIONAL LABOR RELATIONS   BOARD | ) | |
| | ) | |
| Respondent/Cross-Applicant | ) | |
| | ) | |
| and | ) | |
| | ) | |
| INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS, AND HELPERS, AFL-CIO | ) ) ) ) | |
| | ) | |
| Intervenor | ) | |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 31, 2023, the foregoing Brief was filed with the United States Court of Appeals for the Fourth Circuit via the CM/ECF system, and that a copy was served on all parties or their counsel via the CM/ECF system.

Dated: January 31, 2023

Respectfully Submitted,

/s/ *Brandon E. Wood*

Blake & Uhlig, P.A.

753 State Ave., Suite 475
Kansas City KS, 66101
(913)321-8884
bew@blake-uhlig.com

Attorneys for Intervenor